**GLAZER'S WHOLESALE DRUG CO., INC., et al., Plaintiffs,**

v.

**State of KANSAS, et al., Defendants.**

**No. 99–2363–DJW.**

United States District Court, D. Kansas.

Jan. 31, 2001.

Roger M. Theis, John T. Moore, Coy M. Martin, Hinkle Elkouri Law Firm, L.L.C., Wichita, KS, for plaintiffs.

Richard L. Cram, Christopher J. Tymeson, Kansas Dept. of Revenue, Bureau of Legal Services, Topeka, KS, David J. Dunlap, Topeka, KS, Laura M. Graham, Lawrence, KS, Joseph Brian Cox, Kansas Dept. of Revenue, Topeka, KS, Ezra Ginzburg, Lawrence, KS, for defendants.

**MEMORANDUM AND ORDER**

WAXSE, United States Magistrate Judge.

Plaintiffs bring this action for declaratory and injunctive relief challenging the constitutionality of certain provisions within the Kansas Liquor Control Act, K.S.A., 41–101 *et seq.* ("KLCA" or "the Act"). More specifically, Plaintiffs assert those provisions within the KLCA that prohibit nonresident individuals—or any corporation containing a nonresident officer, director or shareholder—from obtaining a license to distribute beer, wine or distilled spirits within the State of Kansas violate the Commerce Clause of the United States Constitution.[1]

The Defendants in this cause of action are Karla J. Pierce, in her official capacity as Secretary of the Kansas Department of Revenue, and Robert G. Longino, in his official capacity as Director of the Kansas Department of Revenue, Division of Alcoholic Beverage Control ("ABC").[2] The matter is presently before the Court on the cross-summary judgment motions of Plaintiffs (doc. 47) and Defendants (doc. 50). For the reasons set forth below, Defendants' motion for summary judgment is denied and Plaintiffs' motion for summary judgment is granted.

## I. Facts[3]

Plaintiff Glazer's Wholesale Drug Company, Inc. ("Glazer's") is a Texas corporation engaged in business as a wholesale distributor of wine, beer and distilled spirits. Plaintiffs Bennett Glazer, Michael Glazer and Robert Glazer are residents of Texas, are Glazer's stockholders and are members of Glazer's board of directors. Plaintiffs A.B. Sales, Inc. ("A.B.Sales") and Premier Beverage, Inc. ("Premier") are Kansas corporations engaged in business as wholesale distributors of wine, beer and distilled spirits. Both A.B. Sales and Pre-

---

1. Plaintiffs also assert in their Complaint that the KLCA residency provisions violate the Privilege and Immunities Clause of the United States Constitution. Plaintiffs opted, however, not to move for summary judgment on those grounds.

2. Upon Defendants' motion, and without objection from Plaintiffs, this Court previously dismissed the State of Kansas and the Kansas Department of Revenue as defendants in this matter. See Memorandum and Order dated April 7, 2000 (doc. 32). Moreover, although Jim Conant, in his official capacity as Director of the Division of Alcoholic Beverage Control, originally was named in the Complaint as a defendant, Robert G. Longino replaced Jim Conant as Director of the ABC on January 6, 2000. On January 21, 2000, Defendants filed a notice of substitution of party to reflect that change.

3. The following facts are uncontroverted or viewed in a light most favorable to Defendants in accordance with the summary judgment standard applicable to Plaintiffs' Motion.

mier currently are licensed to do business in Kansas as wholesale distributors of beer, wine and distilled spirits. Plaintiff David Binter is majority shareholder and President of A.B. Sales. Plaintiffs Mary A. Cray, James Baird and David Zaudke are shareholders of Premier and Plaintiff Richard Cray is President of Premier.

On or around July 15, 1999, plaintiff Glazer's agreed to purchase from plaintiffs A.B. Sales and Premier assets relating to the wholesale distribution of alcoholic liquor. Plaintiffs assert they are unable to consummate the purchase, however, because section 41–311(d) of the Kansas Liquor Control Act prohibits a nonresident person or entity such as Glazer's from obtaining a license to do business in Kansas as a wholesale distributor of beer, wine or distilled spirits.

A. Facts Related to the Kansas Liquor Control Act

In 1949, following repeal of the Kansas constitutional prohibition of manufacture and sale of intoxicating liquors, the Kansas legislature enacted the Kansas Liquor Control Act, a comprehensive act regulating every aspect of liquor from its manufacture or importation into the State of Kansas until its eventual retail sale for consumption. K.S.A. 41–101 et seq.; see, also, Tri–State Hotel Co. v. Londerholm, 195 Kan. 748, 408 P.2d 877 (1965).[4]

The Act establishes a three-tiered system regarding importation, distribution, sale and consumption of alcoholic liquor within Kansas consisting of manufacturers, distributors and retailers. Id. A manufacturer is defined by the Act as a "brewer, fermenter, distiller, rectifier, wine maker, blender, processor, bottler or person who fills or refills an original package and others engaged in brewing, fermenting, distilling, rectifying or bottling alcoholic liquor, beer or cereal malt beverage." K.S.A. 41–102(o)(1) (Supp.1999). A distributor is defined by the Act as the "person importing or causing to be imported into the state, or purchasing or causing to be purchased within the state, alcoholic liquor for sale or resale to retailers licensed under K.S.A. 41–2702." K.S.A. 41–102(h) (Supp.1999). A retailer is defined by the Act as "a person who sells at retail or offers for sale at retail, alcoholic liquors." K.S.A. 41–102(v)(1) (Supp.1999).

The Act requires that any person or entity desiring to be a manufacturer, distributor or retailer of alcoholic beverages in the State of Kansas possess a license issued by the Kansas Division of Alcoholic Beverage Control ("ABC").[5] K.S.A. 41–304. Licenses are issued for a term not to exceed one year and are renewable on an annual basis. K.S.A. 41–326. The KLCA establishes different criteria for the various classes of licenses and, as summarized in the table below, does not uniformly require Kansas residency as a precondition to receiving a license from the ABC:

| | Applicant is an Individual | Applicant is a Corporation |
| --- | --- | --- |
| **Manufacturer's License** | Must be current Kansas resident and have resided in | **No residency requirement** for either corporation or its |

4. The KLCA confers authority upon the Kansas Department of Revenue to implement and enforce the provisions of the Act. The KLCA also creates the Division of Alcoholic Beverage Control ("ABC") as the state agency directly responsible for the administration and enforcement of the Act.

5. The KLCA prohibits "tied-houses"; thus no person operating under a license issued within one tier of the system can operate under a license issued in any other tier of the system. K.S.A. 41–312; K.S.A. 41–704.

| | | |
|---|---|---|
| | Kansas for **5 years** immediately preceding application. | officers, directors and stockholders. |
| **Distributor's License (Wine & Distilled Spirits)** | With one exception [6], must be current Kansas resident and have resided in Kansas for **10 years** immediately preceding application. | With one exception [6], each officer, director and stockholder must be current Kansas resident and have resided in Kansas for **10 years** immediately preceding application. |
| **Distributor's License (Beer)** | Must be current Kansas resident and have resided in Kansas for **1 year** immediately preceding application (unless licensed as a beer wholesaler on September 1, 1948). | Each officer, director and stockholder must be current Kansas resident and have resided in Kansas for **1 year** immediately preceding application (unless licensed as a beer wholesaler on September 1, 1948). |
| **Retailer's License (Off Premises)** | Must be current Kansas resident and have resided in Kansas for **4 years** immediately preceding application. | **Ineligible** for license. |
| **Retailer's License (Liquor by the Drink)** | Must be current Kansas resident and have resided in Kansas for **1 year** immediately preceding application. | **No residency requirement** for either corporation or its officers, directors and stockholders. |
| **Microbrewery or Farm Winery License** | Must be current Kansas resident and have resided in Kansas for **4 years** immediately preceding application. | 50% or more of stockholders must be current Kansas residents and have resided in Kansas for 4 years immediately preceding application. |

*See* K.S.A. 41–311(b)–(g) (Supp.1999); K.S.A. 41–2623 (emphasis added).

B. Facts Related to Conducting Background Investigations

The ABC has access to the Kansas Criminal Justice Information System (KCJIS) [7], which contains criminal history information from the State of Kansas. In reviewing an application for license submitted to it by a corporation, it is the practice of ABC to run a KBARS check on the Kansas resident agent, all officers and directors of the corporation and any shareholder listed as owning more than 5% of the stock of the corporation. If this check reveals a conviction of a felony or of a disqualifying morals charge, the application is summarily denied.

The FBI maintains a national criminal history data base, which is located in a

---

6. As an exception to the above-stated residency requirements for a distributor's license, a nonresident of Kansas may receive a distributor's license if he/she has held a Kansas distributor's license for at least ten years preceding the date of application for renewal. See K.S.A. 41–311(g) (Supp.1999). Thus, if a Kansas resident distributor has operated in Kansas under licensure by the ABC for ten consecutive years, the distributor will not be disqualified from further licensure even if its officers, directors and shareholders have become, at the time of renewal, residents of other states, provided the distributor appoints a Kansas resident agent and files a duly authenticated power of attorney authorizing such agent to accept service of process.

7. This System is also known as KBARS (Kansas Browser Abstract System) and is operated by the Kansas Bureau of Investigation.

system designated as the National Crime Information Center (the "NCIC"). See 28 C.F.R. § 20.20. Regulations promulgated by the United States Department of Justice set forth a procedure whereby state licensing agencies can access the NCIC records system in order to obtain the criminal history backgrounds of licensing applicants. 28 C.F.R. §§ 20.21 and 20.33. Before such access is allowed, the state legislature must initiate legislation authorizing the agency to do so. *Id.*

Pursuant to action taken by the Kansas legislature, the following state agencies have been authorized to obtain criminal history information from the NCIC:

- the Attorney General, for the purpose of determining the fitness of applicants for private detective licenses. K.S.A. 75–7b04(a)(6) (Supp.1999);
- the Attorney General, for the purpose of certifying persons as firearm's trainers. K.S.A. 75–7b21(b)(4) (Supp. 1999);
- the Kansas Lottery, regarding qualifications of persons seeking procurement contracts with the agency. K.S.A. 74–8704(a)(9); K.S.A. 74–8705(c) (Supp.1999);
- the State of Kansas Gaming Agency, for purposes of license applicants in tribal gaming or for employment with the agency. K.S.A. 74–985(j), (*l*) and (m); and
- the Kansas Racing and Gaming Commission, for purposes of licensing to engage in parimutuel racing. K.S.A. 74–8804(n) and (*o*) (Supp.1999).

The ABC itself currently is authorized to access the NCIC system: (1) in connection with an authorized criminal justice investigation; and (2) in connection with a background investigation for criminal justice employment. Defendants' Response to Plaintiffs' First Request to Admit No. 12 at p. 5.

## II. Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In applying this standard, the Court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Adler v. Wal–Mart Stores, Inc.,* 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim." *Id.* (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Id.* (citing *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505).

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Id.* at 670–71. In attempting to meet that standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim. *Id.* at 671 (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson,* 477 U.S. at 256, 106 S.Ct. 2505; *see also Adler,* 144 F.3d at 671 n. 1 (concerning shifting burdens on summary judgment). The nonmoving party may not

simply rest upon its pleadings to satisfy its burden. *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505. Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Adler*, 144 F.3d at 671. "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Id.*

Finally, the Court notes that summary judgment is not a "disfavored procedural shortcut"; rather, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action." *Celotex*, 477 U.S. at 327, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 1).

## III. Analysis

Plaintiffs contend the residency requirement in K.S.A. 41–311(d) of the KLCA creates an impermissible limitation upon interstate commerce in violation of the Commerce Clause. Defendants refute Plaintiffs' contention and go on to argue that even if there was a Commerce Clause violation, K.S.A. 41–311(d) is "saved" from its demise because the Twenty-first Amendment to the United States Constitution grants the states broad and sweeping authority to regulate in the area of alcoholic beverages. The Court begins its analysis by turning to the Commerce Clause.

### A. The Commerce Clause

■ The Commerce Clause expressly empowers Congress to regulate commerce among the states. U.S. Const. Art. I, § 8, cl. 3. "Though phrased as a grant of regulatory power to Congress, the Clause has long been understood to have a 'negative' aspect that denies the states the power unjustifiably to discriminate against or burden the interstate flow of articles of commerce." *Oregon Waste Systems, Inc. v. Dept. of Env. Quality*, 511 U.S. 93, 97, 114 S.Ct. 1345, 128 L.Ed.2d 13 (1994) (cit-

ing *Wyoming v. Oklahoma*, 502 U.S. 437, 454, 112 S.Ct. 789, 117 L.Ed.2d 1 (1992); *Welton v. Missouri*, 91 U.S. 275, 23 L.Ed. 347 (1875)). This limitation on a state's power is known as the "dormant" Commerce Clause. *Id.* Under the dormant Commerce Clause, states are prohibited from placing themselves in positions of economic isolation by enacting protectionist statutes. *Lewis v. BT Inv. Managers, Inc.*, 447 U.S. 27, 36, 100 S.Ct. 2009, 64 L.Ed.2d 702 (1980).

The United States Supreme Court has developed a two-tiered approach in analyzing challenges to state regulations based on the dormant Commerce Clause. As the following discussion establishes, state laws that discriminate against interstate commerce are more strictly scrutinized than those that only incidentally burden interstate commerce. "Discriminate" has been defined by the Supreme Court in this context as "differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Oregon Waste Systems, Inc. v. Dept. of Env. Quality*, 511 U.S. at 99.

■ Under the first tier, nondiscriminatory regulations having only incidental effects on interstate commerce are held valid unless, in balancing the interests, "the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Id.* (quoting *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970)). Under the second tier, however, regulations found to overtly discriminate in their restrictions on interstate commerce are held to be "virtually per se invalid." *Id.* (citing *Chemical Waste Management, Inc. v. Hunt*, 504 U.S. 334, 344 n. 6, 112 S.Ct. 2009, 119 L.Ed.2d 121 (1992); *Philadelphia v. New Jersey*, 437 U.S. 617, 624, 98 S.Ct. 2531, 57 L.Ed.2d 475 (1978)). Measures that discriminate against interstate commerce in

this fashion are routinely struck down unless "the discrimination [they impose] is demonstrably justified by a valid factor unrelated to economic protectionism." *New Energy Co. of Indiana v. Limbach,* 486 U.S. 269, 274, 108 S.Ct. 1803, 100 L.Ed.2d 302 (1988); *see, also, Maine v. Taylor,* 477 U.S. 131, 138–39, 106 S.Ct. 2440, 91 L.Ed.2d 110 (1986). Notably, a finding of discriminatory economic protectionism may be made on the basis of either discriminatory *purpose* of the legislation or its discriminatory *effect*.[8] *Bacchus Imports, Ltd. v. Dias,* 468 U.S. 263, 270, 104 S.Ct. 3049, 82 L.Ed.2d 200 (1984) (citations omitted) (emphasis added).

█ "Justifications for [such] discriminatory restrictions on commerce [must] pass the 'strictest scrutiny.'" *Oregon Waste Systems, Inc. v. Dept. of Env. Quality,* 511 U.S. at 100, 114 S.Ct. 1345 (quoting *Hughes v. Oklahoma,* 441 U.S. 322, 337, 99 S.Ct. 1727, 60 L.Ed.2d 250 (1979)). The burden rests with the state to justify its statutes and such "burden of justification is so heavy that 'facial discrimination by itself may be a fatal defect.'" *Id.* Due to this strict scrutiny, those defending the regulations must show that, even in cases where the regulations are justified by valid factors unrelated to economic protectionism, the discriminatory regulations advance "a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives." *Id.* (citing *New Energy Co. of Ind. v. Limbach,* 486 U.S. at 274, 108 S.Ct. 1803; *Chemical Waste,* 504 U.S. at 342–343, 112 S.Ct. 2009).

█ Based on this sliding scale of scrutiny, the first step in analyzing a state law under the dormant Commerce Clause is to determine whether it "regulates evenhandedly with only 'incidental' effects on interstate commerce, or discriminates against interstate commerce."[9] *Id.* at 99 (quoting *Hughes v. Oklahoma,* 441 U.S. at 336, 99 S.Ct. 1727). Upon review of the residency requirement in K.S.A. 41–311(d), there is no question that it discriminates against interstate commerce—it erects a formidable[10] barrier to entry of nonresident liquor distributors to the Kansas market. Because 41–311(d) is discriminatory as applied to nonresidents of the State of Kansas, the virtually per se rule of invalidity provides the proper legal standard here, not the *Pike* balancing test.

8. Thus, contrary to Defendants' assertions, it is not necessary to prove that economic protectionism was the legislature's purpose in enacting the residency requirement in order to make a finding of discrimination due to economic protectionism.

9. Defendants argue the Court should not analyze 41–311(d) under the dormant Commerce Clause at all. More specifically, Defendants allege the Commerce Clause applies only to the movement of goods in interstate commerce. Defendants go on to argue that 41–311(d) does not bar entry of out-of-state liquor (or other tangible good) into Kansas but instead only prohibits nonresidents from providing a service within Kansas. The Court finds this interpretation of the Commerce Clause to be without merit. *See, e.g., C & A Carbone, Inc. v. Town of Clarkstown,* 511 U.S. 383, 114 S.Ct. 1677, 128 L.Ed.2d 399 (1994) (in striking down an ordinance preventing out-of-state waste processors access to the local market, the court observed that "the article of commerce here is not so much the solid waste itself, but rather the service of processing and disposing of it."); *see, also, Milton S. Kronheim & Co. v. District of Columbia,* 91 F.3d 193, 202 (D.C.Cir.1996) (finding the article of commerce to be the service of storing alcoholic beverages.).

10. As noted in the Table, supra, which summarizes the Act's residency requirements, there is a narrow exception to the eligibility requirements for a distributor's license: a nonresident of Kansas may receive a distributor's license if he/she has held a Kansas distributor's license for at least ten years preceding the date of application for renewal. See K.S.A. 41–311(g) (Supp.1999).

As a result, the 41–311(d) residency requirement must be strictly scrutinized and, after such strict scrutiny, be invalidated unless Defendants can show "the discrimination [it imposes] is demonstrably justified by a valid factor unrelated to economic protectionism" and that it advances "a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives." *Chemical Waste*, 504 U.S. at 342, 112 S.Ct. 2009.

In considering the purpose behind certain legislation, one typically begins by looking at the specific legislative history associated with the statutory provisions at issue. In passing the KLCA, however, the legislature apparently did not discuss the rationale behind the 41–311 residency requirements, because there is no legislative history associated with these residency provisions.[11] Relying on a 1995 opinion published by the Kansas Attorney General, as well as a 1986 report published by the Kansas Liquor Law Review Commission, Defendants attempt in hindsight to justify the residency requirement in 41–311(d) by asserting it was adopted "to further temperance and to protect the general welfare, health and safety of the people of Kansas." Defendants' Memorandum in Support of Summary Judgment at p. 14 (doc. 51). Upon consideration of this extremely "generic" justification, the Court is unable to find any plausible nexus between the exclusion of nonresident applicants and the state's purported objective of promoting temperance and protecting Kansas citizens. *See Cooper v. McBeath*, 11 F.3d 547, 554 (5th Cir.) (in striking down a Texas statute permitting only state residents to obtain liquor licenses, the court held "protect[ing] the health, safety, welfare, morals and temperance of its citizens" was merely

"boilerplate enabling language [that] hardly explains the state's particular restrictions on out-of-state ownership of various liquor licenses" and were "unpersuasive and insufficient justifications to defend the state's arbitrary treatment of non-Texans"), *cert. denied*, 512 U.S. 1205, 114 S.Ct. 2675, 129 L.Ed.2d 810 (1994). Thus, the Court rejects the validity of this justification.

Defendants also assert in hindsight, however, that a non-economic protectionism rationale for the residency requirement in 41–311(d) is facilitating background investigations to minimize the infiltration of criminal elements in the Kansas liquor industry. Defendants' Memorandum in Support of Summary Judgment at p. 3, ¶ 5 (doc. 51). In support of this rationale, Defendants assert (1) the crime rates in other states are higher than the crime rate in Kansas; and (2) the ability of a Kansas agency to investigate an out-of-state applicant's reputation and qualifications is more limited than its ability to investigate a Kansas applicant's reputation and qualifications. Given this more specific assertion, the question presented is whether facilitating background investigations to minimize the infiltration of criminal elements is a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives.

 In light of the facts presented, the Court finds Defendants' assertions are not legitimate, or in this case credible, goals of the 41–311(d) residency requirement. First, the Court is not persuaded that the 1985–1990 crime statistics presented by Defendants (showing certain states with

11. Although Defendants state they are continuing to search, they admit that, to date, they are unable to find legislative history discussing the purpose of the K.S.A. 41–311 residency requirements. Defendants' Response to Plaintiffs' Motion for Summary Judgment at p. 4, ¶ 24 (doc. 54).

higher crime rates than Kansas) support the premise that a residency requirement will minimize criminal infiltration of the Kansas liquor industry. First, the residency requirement discriminates against persons in *all* states, including those with crime rates lower than Kansas. Second, there is no evidence to establish that the crime statistics of a certain state are related to the criminality of its residents. This is because the statistics listed represent the crime rate in the state where the crime was committed, not the state where the criminal resided when he or she committed the crime.[12] Thus, by conducting a criminal background check on Kansas residents through the Kansas Bureau of Investigation system, but not through the national criminal history system, the ABC cannot discover whether the Kansas resident has been a criminal in any other state.

Lastly, Defendants presented no evidence to support their conclusory assertion that the ability of a Kansas agency to investigate an out-of-state applicant's reputation and qualifications is more limited than its ability to investigate a Kansas applicant's reputation and qualifications. Because the Court is unable to find any plausible nexus between the exclusion of nonresident applicants and the state's purported objective of facilitating background investigations to minimize infiltration of criminal elements, the Court cannot find the residency requirement in 41–311(d) legitimately promotes a state interest.[13]

 Even if Defendants could establish that the residency requirement promoted a legitimate state interest, the Court still would find 41–311(d) fatally de-fective because Defendants have failed to establish the unavailability of neutral, non-discriminatory alternatives adequate to protect the interests at stake. *See Chemical Waste*, 504 U.S. at 341–42, 112 S.Ct. 2009 (laws promoting even a legitimate purpose are invalid where their effect is to discriminate against interstate commerce).

It appears to the Court that if facilitating background investigations to minimize infiltration of criminal activity into the Kansas liquor industry is the concern, there are several less restrictive alternatives to the current statutory scheme, which basically prohibits entry of nonresident liquor distributors to the Kansas market. In this modern era of information highways and instant communication abilities, conducting an interstate investigation would seem just as easy as conducting an intrastate one. For example, federal regulations promulgated by the United States Department of Justice set forth a procedure whereby state licensing agencies can access the federal NCIC records system in order to obtain the *national* criminal history background of a licensing applicant. As set forth in the Facts Section of this opinion, *supra*, the following Kansas state agencies already are authorized to obtain national criminal history information from the NCIC: the Attorney General (licenses for private detective and firearm's trainers), the Kansas Lottery (qualifications of persons seeking contracts), the State of Kansas Gaming Agency (license for tribal gaming or employment with agency) and Kansas Racing and Gaming Commission (license for parimutuel racing). In fact,

---

12. For example, if a Kansas resident commits a crime in the bordering State of Missouri, the statistics would reflect it as a Missouri crime, even though the criminal was a resident of the State of Kansas.

13. The fact that the state inconsistently allows corporate liquor-by-the-drink retailers, corpo-rate manufacturers and a certain percentage of corporate microbrewery shareholders to be nonresidents (see Table, supra, which summarizes the Act's residency requirements), undercuts Defendants' claim that the 41–311(d) residency requirement legitimately promotes a state interest.

the ABC itself currently accesses the NCIC system in connection with an authorized criminal justice investigation and in connection with a background investigation for criminal justice employment.

In addition to availability of a national system in which to retrieve criminal history for license applicants, the ABC could retrieve additional information about license applicants by requiring nonresident liquor distributorship license applicants to furnish whatever information the state deems necessary, including but not limited to requesting the applicant furnish the NCIC background checks to the state themselves [14] and/or requesting the applicant sign a waiver and release to permit more rigorous verification checks. Once a nonresident is licensed, Kansas easily could use its existing regulatory tools and enforcement powers to scrutinize the conduct of and sanction any misconduct by a licensee with nonresident owners/officers.

Based on the discussion above, the Court finds the state could meet its objective of minimizing criminal infiltration into the Kansas liquor industry by a much less restrictive method than the current statutory scheme banning nonresident distributorship license applicants altogether. Because Defendants have failed to demonstrate "the unavailability of nondiscriminatory alternatives adequate to preserve the local interests at stake," *Chemical Waste*, 504 U.S. at 342, 112 S.Ct. 2009, the Court holds the 41-

311(d) residency requirement violates traditional Commerce Clause principles.[15]

## B. The Twenty First Amendment

■ Defendants go on to argue that even if the residency requirement in 41–311(d) violates the Commerce Clause, the statute is saved because the Twenty-first Amendment to the United States Constitution grants broad and sweeping authority to the states to regulate in the area of alcoholic beverages.

The Twenty-first Amendment includes three sections. The first section simply repeals the Eighteenth Amendment. U.S. Const. Amend. XXI, § 1. The second section, and the one relied on by Defendants here, provides that "[t]he transportation or importation into any State, Territory, or possession of the United States for delivery or use therein of intoxicating liquors, in violation of the laws thereof, is hereby prohibited." U.S. Const. Amend. XXI, § 2. The third section sets a time limit of seven years for the states to ratify the Amendment. U.S. Const. Amend. XXI, § 3. The issue at hand is whether the Twenty-first Amendment overrides the rigors of the Commerce Clause under the facts presented in this case. For the following reasons, the Court finds that it does not.

- Evolution of the Interplay between the Commerce Clause and the Twenty-first Amendment

---

**14.** Pursuant to 28 C.F.R. §§ 16.32 and 16.33, an individual who wishes to obtain a copy of his or her NCIC record may do so by submitting a written request to the Federal Bureau of Investigation ("FBI").

**15.** Defendants extensively rely on the case of *Coolman v. Robinson,* 452 F.Supp. 1324 (N.D.Ind.1978) to support the proposition that the residency requirement in K.S.A. 41–311(d) serves a legitimate state interest and thus should be upheld. The decision in *Cool-*

*man,* however, is inapposite given the plaintiff there alleged the residency requirement for an alcoholic beverage permit was unconstitutional pursuant to the Fourteenth Amendment. In considering whether Indiana's liquor residency requirement was constitutional under the equal protection clause, as opposed to the Commerce Clause, the *Coolman* court subjected the statute to only a rational basis review and placed the burden on the plaintiff to demonstrate the statute was constitutionally unsound.

Upon review of the cases reconciling the interplay between the Commerce Clause and the Twenty-first Amendment, the United States Supreme Court has evolved from a very broad reading of the Amendment to a much more narrow interpretation of its scope. "Older case law embraced the broad proposition that the Amendment had granted the states almost unfettered authority to regulate commerce in intoxicating liquors unconstrained by negative Commerce Clause restrictions." *Cooper v. McBeath,* 11 F.3d at 555 *(citing State Board of Equalization v. Young's Market Co.,* 299 U.S. 59, 62, 63, 57 S.Ct. 77, 81 L.Ed. 38 (1936)).

As time passed, however, the Supreme Court increasingly narrowed the states' broad powers to regulate the importation of liquor and ultimately recognized that the Twenty-first Amendment did not confer virtually complete control to the states in structuring their liquor distribution system. *See Hostetter v. Idlewild Bon Voyage Liquor Corp.,* 377 U.S. 324, 331–32, 84 S.Ct. 1293, 12 L.Ed.2d 350 (1964) (holding it would be an "absurd oversimplification" to draw a conclusion "that the Twenty-first Amendment has somehow operated to 're-peal' the Commerce Clause wherever regulation of intoxicating liquors is concerned."). The Supreme Court observed that "[b]oth the Twenty-first Amendment and the Commerce Clause are parts of the same Constitution. Like other provisions of the Constitution, each must be considered in light of the other and in the context of the issues and interests at stake in any concrete case." *Id.*

Since *Hostetter,* the Supreme Court has continued to restrict the scope of power provided to the states by the Twenty-first Amendment. In narrowing the scope of state powers, the Supreme Court increasingly has taken into consideration the relationship between, and effect on each other of, federal and state interests. See *Cali-fornia Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.,* 445 U.S. 97, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980) (holding California statutory wine-pricing scheme was not shielded by the Twenty-first Amendment from Sherman Act proscriptions against such anticompetitive pricing arrangements). In *Midcal,* the Supreme Court stressed that "important federal interests in liquor matters survived the ratification of the Twenty-first Amendment" and "there is no bright line between federal and state powers over liquor." *Id.* at 108–10, 100 S.Ct. 937. Although the *Midcal* Court noted that "the Twenty-first Amendment grants the states virtually complete control over whether to permit importation or sale of liquor and how to structure the liquor distribution system," the Supreme Court emphasized that "those controls may be subject to the federal commerce power in appropriate situations. The competing state and federal interests can be reconciled only after careful scrutiny of those concerns in a 'concrete case.'" *Id.* at 110, 100 S.Ct. 937(citing *Hostetter v. Idlewild,* 377 U.S. at 332, 84 S.Ct. 1293). Characterizing the new approach as a "pragmatic effort to harmonize state and federal powers," the Supreme Court noted that "[t]he federal interest in enforcing the national policy in favor of competition is both familiar and substantial." *Id.* at 109–10, 84 S.Ct. 1293.

In 1984, the Supreme Court further clarified its interpretation of the interplay between the Twenty-first Amendment and the Commerce Clause by actually establishing a balancing test for cases with conflicts between state and federal law: "whether the interests implicated by a state regulation are so closely related to the powers reserved by the Twenty-first Amendment that the regulation may prevail, notwithstanding that its requirements directly conflict with express federal policies." *Capital Cities Cable, Inc. v. Crisp,*

467 U.S. 691, 104 S.Ct. 2694, 81 L.Ed.2d 580 (1984) (holding an Oklahoma ban against carrying wine commercials on cable television is not saved from preemption by the Twenty-first Amendment because a statute in conflict with Federal Communications Commission regulations and the state's power to regulate liquor was not directly implicated).

In the same month it decided Capital Cities, the Supreme Court handed down the case of *Bacchus Imports, Ltd. v. Dias*, 468 U.S. 263, 104 S.Ct. 3049, 82 L.Ed.2d 200 (1984), its most instructive decision to date regarding the relationship between the Twenty-first Amendment and the dormant Commerce Clause. In reviewing a Hawaii state liquor tax exempting some locally produced alcoholic beverages, the *Bacchus* Court stated "one thing is certain: [t]he central purpose of the [Twenty-first Amendment] was not to empower states to favor local liquor industries by erecting barriers of competition. It is also beyond doubt that the Commerce Clause itself furthers strong federal interests in preventing economic Balkanization." *Id. at* 276, 104 S.Ct. 3049. The Supreme Court went on to declare that "state laws that constitute mere economic protectionism are . . . not entitled to the same deference as laws enacted to combat the perceived evils of an unrestricted traffic in liquor." *Id.* (citations omitted). Using the balancing test just espoused in Capital Cities, the Supreme Court struck down the Hawaii statute as unconstitutional, holding it "violates a central tenet of the Commerce Clause" and "is not supported by any clear concern of the Twenty-first Amendment." *Id.*

Several federal courts subsequently have applied the *Bacchus* "core powers" balancing test. These courts consistently have held that in order to be "saved" by the Twenty-first Amendment, the state's exercise of reserved powers must be genuinely directed to the goals of temperance and avoidance of the evils of unregulated trafficking in liquor. See *Cooper v. McBeath*, 11 F.3d at 555 (in striking down a Texas statute permitting only state residents to obtain liquor licenses, the court held that "[t]he core concerns underlying the Twenty-first Amendment are not entitled to greater weight than the principle of nondiscrimination animating the Commerce Clause"); *Dickerson v. Bailey*, 87 F.Supp.2d 691, 709–10 (S.D.Tex.2000) (upon application of core powers balancing test, court held Texas anti-direct-shipment law facially discriminated against interstate commerce and could not be saved by the Twenty-first Amendment because the state failed to prove there were no "reasonable nondiscriminatory alternatives" in exercising its core powers); *Loretto Winery Ltd. v. Gazzara*, 601 F.Supp. 850, 863 (S.D.N.Y.1985) (balancing the state's interest in exerting core Twenty-first Amendment powers with the dormant Commerce Clause, the court held that "[w]hatever the state interest in limiting the sale of a 'wine product,' it is clear that such interest could be served equally well by resorting to alternatives less burdensome to interstate commerce"), aff'd. sub. nom., *Loretto Winery, Ltd. v. Duffy*, 761 F.2d 140 (2d Cir. 1985).

### K.S.A. 41–311(d) and the Core Concerns of the Twenty-first Amendment

Applying the relevant law to the undisputed facts here, the Court finds the 41–311(d) residency requirement is not genuinely directed to the goal of temperance and avoidance of the evils of unregulated trafficking in liquor, which consistently have been held to be the "core concerns" of the Twenty-first Amendment. The residency requirement has nothing to do with the manner of liquor distribution in Kansas or compliance with governing standards applicable to such distribution. Summarily excluding a nonresident from the right to distribute liquor in Kansas

just because the applicant has not resided in the State of Kansas for ten years cannot be said to genuinely bear on whether the applicant will comport himself according to governing standards and distribute liquor in the state in a moral and ethical manner. Such summary denial is especially offensive in light of the Court's findings, supra, that there are neutral, nondiscriminatory alternatives readily available to protect Defendants' interests in conducting comprehensive and accurate background checks on nonresident applicants to minimize the infiltration of crime in Kansas. See *Dickerson v. Bailey*, 87 F.Supp.2d at 709–10 (where court held Texas anti-direct-shipment law facially discriminated against interstate commerce and could not be saved by the Twenty-first Amendment because the state did not prove there were no "reasonable nondiscriminatory alternatives" in exercising its core powers).[16]

## IV. Conclusion

Based on the discussion above, the Court finds, rather than exercising a core concern of the Twenty-first Amendment, the challenged residency requirement constitutes nothing more than "mere economic protectionism" and works only to insulate Kansas residents from outside competition. See *Cooper v. McBeath*, 11 F.3d at 555 ("While courts have recognized generally

the need 'to combat the perceived evils of an unrestricted traffic in alcoholic beverages' as a permissible, if vague, purpose of the Twenty-first Amendment, 'laws that constitute mere economic protectionism are ... not entitled to the same deference.' ") (quoting *Bacchus*, 468 U.S. at 276, 104 S.Ct. 3049). As such, the Twenty-first Amendment fails to "save" the residency requirement at issue from this Court's finding, supra, that the residency requirement in section 41–311(d) of the KLCA is an impermissible limitation on interstate commerce in violation of the dormant Commerce Clause.

Accordingly, it is hereby ordered that Plaintiffs' motion for summary judgment is granted and Defendants' cross motion for summary judgment is denied. It is further ordered that the residency requirement found in K.S.A. 41–311(d) is hereby declared to be unconstitutional and Defendants, their successors, agents, and employees are enjoined and restrained from implementing, enforcing, or acting in reliance upon the K.S.A. 41–311(d) residency requirement.

Pursuant to 42 U.S.C. § 1988, Plaintiffs are entitled to an award of attorneys fees, costs, and expenses associated with the prosecution of this case. Counsel are ordered to confer and attempt to reach an

---

**16.** Significantly, and inconsistent with Defendants' claim that the 41–311(d) residency requirement is genuinely directed to core concerns of the Twenty-first Amendment, Kansas already permits substantial nonresident participation in liquor manufacturing and retailing. As to manufacturing, the KLCA does not require Kansas residency of a corporation or its officers, directors and shareholders as a precondition to receipt of a permit by such corporation. In fact, a corporate applicant for a manufacturer's license is not disqualified from licensure even if its shareholders are felons or otherwise disqualified under K.S.A. 41–311(a)(1)–(12) as long as no shareholder owns more than 25% of the stock. K.S.A. 41–311(c)(1).

With regard to microbrewery and farm winery licenses, a corporate applicant is eligible for such license even if 49% of the stock is owned by nonresidents of Kansas. As to liquor retailing, which involves direct dealings with the consuming public, the Club and Drinking Establishment Act permits nonresidents to form a Kansas corporation to engage in the business of on-premises sales of liquor to the public. K.S.A. 41–2623(a)(6). Such corporate applicant for on-premises sales of liquor is not ineligible for licensure even if its shareholders are felons or otherwise disqualified, provided that each such shareholder does not own more than 5% of the stock. *Id.*

agreement regarding the fee award. See D.Kan. Rule 54.2.

IT IS SO ORDERED.